IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESTELLE M., | : | CIVIL ACTION |
| *for A.C., a Minor,* | : | |
| | : | |
| v. | : | |
| | : | No. 23-cv-2906 |
| CAROLYN W. COLVIN, | : | |
| *Acting Commissioner of Social* | : | |
| *Security.* | | |

**<u>MEMORANDUM OPINION</u>**

**CRAIG M. STRAW**                                    **January 9, 2025**
**United States Magistrate Judge**

      Plaintiff, Estelle M., seeks review of the Commissioner's decision denying her

application for Supplemental Security Income ("SSI") on behalf of her grandson, A.C., under the

Social Security Act ("Act").  The parties consented to proceed before a Magistrate Judge.[1]  Doc.

4.  For the following reasons, I deny Plaintiff's request for review and affirm the

Commissioner's decision.

**I.      <u>PROCEDURAL HISTORY</u>**

      Plaintiff originally filed an application for SSI benefits pursuant to Title XVI on July 16,

2020.  R. 17, 182.  A.C.'s alleged disability onset date ("AOD") was August 11, 2013.  R. 17, 92,

183, 200, 210.  The claim was denied initially on January 27, 2021, and again on reconsideration.

R. 117, 124-25  Plaintiff requested a hearing before an administrative law judge ("ALJ").  R.

135.

---

[1] <u>See</u> Doc. 4; 28 U.S.C. § 636(c)(a) & Fed. R. Civ. P. 73(a).

Due to the COVID-19 Pandemic, ALJ Jennifer Lash held a telephone hearing on November 18, 2021.  R. 17, 34, 36.  Stephanie M. Imbesi, Esquire, appeared for the claimant and Plaintiff testified on behalf of A.C.  R. 17, 36.  The ALJ issued a decision on March 2, 2022, finding A.C. was not disabled and denied benefits.  R. 28-29.  Plaintiff filed a request for review of the ALJ's decision, which was denied.  R. 1.  Therefore, the ALJ's decision became the final decision of the Commissioner.  R. 2; 20 C.F.R. § 416.1481.  Plaintiff then initiated this action in federal court.  Doc. 1.[2]  Plaintiff filed a Brief and Statement of Issues in Support of Her Request for Review, Defendant filed a Response to Request for Review of Plaintiff, and Plaintiff filed a Reply Brief.  Docs. 8-10.

## II.    LEGAL STANDARDS

To qualify for SSI benefits under the Act, a child claimant must show that he or she is disabled pursuant to 42 U.S.C. § 1382.[3]  There is a three-step sequential analysis to determine whether a child is disabled.  See 20 C.F.R. § 416.924(a)-(d); see also Watkins v. Comm'r Soc. Sec., 131 F. App'x 362, 364 (3d Cir. 2005).  At step one, the ALJ considers if the claimant is engaged in substantial gainful activity, and if the claimant is, he or she is not disabled.  Jaramillo ex rel. Mesa v. Comm'r Soc. Sec., 130 F. App'x 557, 560 (3d Cir. 2005).  At step two, if the claimant is not engaged in substantial gainful activity, the ALJ will determine whether the

---

[2] Citations to the documents on the docket are to the CM/ECF pagination of the documents.

[3] 42 U.S.C. § 1382c(a)(3)(C)(i) provides that a claimant under the age of eighteen is disabled for purposes of the Act "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(c)(i), held unconstitutional on other grounds by Pena Martinez v. U.S. Dep't of Health & Hum. Servs., 478 F. Supp. 3d 155 (D.P.R. Aug. 3, 2020).

claimant's physical or mental impairments are "severe."  Id.  Finally, at step three, if the impairment or impairments are severe, the ALJ will determine if the impairment "meets, medically equals or functionally equals an Impairment Listing ["Listings"] found in 20 C.F.R. § 404, Subpart P, App. 1."  Id.  The claimant bears the burden at each step.  Id.

"If the child's impairment does not medically meet a [L]isting . . . the examiner must determine whether the impairment functionally equals a listing by evaluating the child's six domains of functioning."  Id.; 20 C.F.R § 416.926a(b)(1); T.C. ex rel. Z.C. v. Comm'r Soc. Sec., 497 F. App'x 158, 160-61 (3d Cir. 2012).  These domains are broad areas of functioning to capture what a child is and is not able to do.  Id. § 416.926a(b)(1).  The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  Id. § 416.926a(b)(1)(i)-(vi).

To functionally equal a Listing, the impairment "must be of listing-level severity; that is, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."  See SSR-09-2P, 2009 WL 396032, at *1; 20 C.F.R. § 416.926a(a).  A marked limitation in a domain is when an impairment "interferes seriously with [claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  Day-to-day functioning may be seriously limited for only one activity or when the interactive and cumulative effects of the claimant's impairment or impairments limit several activities.  Id.  A marked impairment is more than a moderate impairment but less than an extreme impairment. Id.

An extreme limitation in a domain is worse than a marked impairment and is when claimant's "impairment(s) interferes very seriously with [claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). The claimant's day-to-day functioning may be very seriously limited when the impairment or impairments limit only one activity or when the interactive and cumulative effects of the impairment or impairments limit several activities. Id. An extreme limitation is the rating given to the worst limitations, however, it "does not necessarily mean a total lack or loss of ability to function." Id. Examples of impairments in the mental context that functionally equal a Listing (but do not constitute the only examples) include any mental impairment causing "complete inability to function independently outside the area of one's home with age-appropriate norms" or a "[r]equirement for 24-hour-a-day supervision for medical (including psychological) reasons" 20 C.F.R. § 416.926a(m)(1), (2).

When looking at functioning, the whole child is considered. Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule—The "Whole Child" Approach, SSR 09-1P, 2009 WL 396031, at *2 (Feb. 17, 2009). The information in the case record and everything the child does at home, at school, and in the community twenty-four hours a day, seven days a week will be evaluated and compared to those other children the same age who do not have the impairments. Title XVI: Determining Childhood Disability—Documenting a Child's Impairment-Related Limitations, SSR 09-2P, 2009 WL 396032, at *1 (Feb. 18, 2009); 20 C.F.R. § 416.926a(b). The ALJ will consider all relevant evidence such as medical evidence, test scores, school records, and information from people who know the child and can discuss his or her functioning, like the child's parents, care givers, and teachers. Ortiz v. Colvin, No. 14-cv-

4

4805, 2016 WL 164995, at *1 (D.N.J. Jan. 14, 2016) (quotations omitted); 20 C.F.R. §

416.924a(a).  While the adjudicators do not need to answer specific questions regarding a child's

limitations, "the evidence should create a clear picture of the child's functioning in the context of

the six functional equivalence domains" so "the severity of limitation in each domain" can be

determined.  SSR 09-2P, at *3.  The "critical element in evaluating the severity of a child's

limitations is how appropriately, effectively, and independently the child performs age-

appropriate activities."  Id.  Generally, it is the ALJ's duty to (1) identify the activities in which

the child engages in each domain; (2) determine whether the child's impairment or impairments

cause limitations in the activity; and (3) rate the severity of the limitations and then determine if

the impairment(s) functionally equals the listings.  Coleman v. Comm'r of Soc. Sec., No. 15-cv-

6484, 2016 WL 4212102, at *2 (D.N.J. Aug. 9, 2016).

When the ALJ assesses a child's functioning, the ALJ must "set forth the reason for h[er]

decision."  Mills-Sorrells v. Colvin, 153 F. Supp. 3d 703, 709 (E.D. Pa. 2015) (citing Burnett v.

Comm'r of Soc. Sec., 220 F.3d 112, 119 (3d Cir. 2000)).  Although no particular language or

format is required, the ALJ must provide an explanation of the findings that permits meaningful

review.  See Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004).

The court's role on judicial review is to determine whether the Commissioner's decision

is supported by substantial evidence.  See 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc.

Sec., 181 F.3d 429, 431 (3d Cir. 1999); Jaramillo, 130 F. App'x at 560.  "Substantial evidence is

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"

and must be "'more than a mere scintilla but may be somewhat less than a preponderance of the

evidence."  Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart,

399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019)

(explaining substantial evidence "means only—'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938) (additional citations omitted)).

III.    **ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW**

A.C. was born in August 2010 and was a school-age child on the date the application was

filed.  R. 18, 24, 37, 77, 182; 20 C.F.R. § 416.926a(g)(2)(iv).  The ALJ found that A.C. had not

engaged in substantial gainful activity since A.C. had no evidence of work activity.  R. 18.  A.C.

had several severe impairments including affective disorder, personality disorder,

neurodevelopmental disorder, autism spectrum disorder (ASD), and trauma-and stressor-related

disorder.  R. 18; 20 C.F.R. § 416.924(c).[4]  The ALJ opined that A.C.'s impairments, either singly

or in combination, did not meet or medically equal any of the applicable Listings.[5]  R. 19; 20

C.F.R. §§ 416.925, 416.926.  She found A.C.'s mental impairments did not satisfy the paragraph

B criteria[6] because he did not have at least two "marked" limitations or one "extreme" limitation.

R. 19-21.  Specifically, the ALJ found moderate limitations in understanding, remembering, or

applying information, interacting and relating with others, and concentrating, persisting, or

---

[4] The ALJ also found that A.C. had a right foot disorder and a growth hormone deficiency but both impairments were not severe, and the record did not substantiate more than minimal limitations from those conditions.  R. 18-19.

[5] The ALJ considered Listings 112.04 (depressive, bipolar, and related disorders), 112.08 (personality and impulse control orders), 112.10 (autism spectrum disorder), and 112.11 (neurodevelopmental disorders).  R. 19.

[6] The four "paragraph B" criteria rate a claimant's functional limitations.  See 20 C.F.R. pt. 404, subpt. P, app. 1.  To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in the four areas of mental functioning.  Id. § 12.00(A)(2).

maintaining pace, and only a mild limitation understanding, remembering, or applying information.  R. 19-21.

The ALJ then turned to the main issue in this case—whether A.C. had an impairment or combination of impairments that functionally equaled the severity of the Listings.  R. 21-28; 20 C.F.R § 416.926a(b)(1).  The ALJ considered how A.C. functioned in the six domains and found that he had less than marked limitations in five of them, and no limitation in the remaining domain.  R. 21-28.  When making those findings the ALJ relied, in part, on prior administrative medical findings and found the opinions of Anthony A. Galdieri, Ph.D., and Michael Francis Lombard, M.D., persuasive.  R. 28, 77-88.  They had opined, as relevant here, that A.C. had no limitation caring for himself, and had less than marked limitations interacting and relating with others and attending and completing tasks.  R. 28, 83-84.  The ALJ found the record supported a finding that A.C. had a greater restriction (less than marked) caring for himself.  R. 28.  At the reconsideration level, the ALJ found that the state agency psychological and medical consultants Francis Matthew Murphy, Ph.D., and Sanjay M Gandhi, M.D.'s findings that A.C. had less than marked limitations interacting and relating with others, caring for himself, and attending and completing tasks, were persuasive.  R. 28, 91-104.  The ALJ ultimately concluded that A.C. had not been disabled since July 16, 2020—the day the application was filed.  R. 28; 20 C.F.R. § 416.924(a).

In Plaintiff's request for review, she focuses on whether the ALJ erred in her findings addressing three of A.C.'s domains of functioning.  Doc. 8, at 4-13.  She claims that the ALJ erred when she found A.C. has less than marked limitations in the domains of interacting and relating with others, caring for himself, and attending and completing tasks.  Id.  The

Commissioner asserts that substantial evidence in the record supports the findings that A.C. has less than marked limitations in the three domains.  Doc. 9, at 9-13.

## IV.    FACTUAL BACKGROUND

First, I describe A.C.'s non-medical background.  A.C. lives with Plaintiff—his paternal grandmother—in a house and she has had legal guardianship of him since he was two years old. R. 43, 184, 193, 268, 295.  From infancy until two years old, A.C. lived back and forth between his father and mother.  R. 295.  A.C.'s father (Plaintiff's son) is deceased and A.C.'s mother was incarcerated and does not have regular contact with him.  R. 64, 267, 270.  A.C.'s mother used drugs during her pregnancy with A.C. and was in a methadone maintenance program.  R. 268, 296.  A.C. was born at full-term and was of average weight.  R. 268.  A.C.'s mother only sees A.C. intermittently because of her drug use and mental health problems but as of March 2020 was doing better.  R. 295-96.  Plaintiff has her own serious cardiac issues and receives Social Security disability.  R. 44, 267, 269, 332.

Plaintiff testified at the hearing.  R. 42-75.  Plaintiff stated that during the time of the pandemic when A.C. was attending virtual school she "never knew how intensive it could be to . . . keep him online and . . . paying attention during the classes, and interactions with the teacher and even the students online."  R. 44, 71.  A.C. continued to receive family-based services during the pandemic as he had before, which included a therapeutic support services ("TSS") worker and a mobile therapist.  R. 48.  Two workers came into Plaintiff's house to meet them for family therapy and to support them if, for example, Plaintiff could not manage A.C.'s behavior.  R. 45, 47.  During much of that time, A.C. continued to see an outpatient therapist through the North East Treatment Center, Youth Services Divisions ("NET") but it ended in August or September

2021.  R. 46-47.  A.C. also saw a psychiatrist at the NET twice a year.  R. 49.  A.C took

medication for his behavior for several months but stopped the medication in the summer of

2021.  R. 49-50.  Plaintiff stopped the medication because A.C. was not sleeping well when

taking it, he was hyper-focused, and his behavior was more explosive and aggressive than usual.

R. 49-51, 267, 299.  Plaintiff believed it was an amphetamine the NET prescribed, probably

Adderall.  R. 50, 299.  Plaintiff informed the NET mobile therapist that A.C. had stopped taking

the medication, however, she did not tell the psychiatrist.  R. 52.

Beginning August or September 2021 during virtual school, A.C. was assigned another

therapist, Mr. Desmond McCaskill, who called and talked to A.C. weekly.  R. 54.  For virtual

school, A.C. received tutoring for all subjects except for gym.  R. 55-56.  Plaintiff said A.C. did

well in gym because he was very high energy.  R. 56.  Plaintiff said that A.C. took Aikido classes

from age five until the pandemic hit and the school closed.  Id.  By March 2020, A.C. had earned

a brown belt in Aikido.  R. 295.  A.C. did not participate in any other activities because Plaintiff

said he had a hard time with social cues and would have difficulty with people "being in his

face."  R. 57.  She explained that when A.C. was young, he tried baseball, but he would fight

with other kids because they lined up too close to him.  Id.  Plaintiff tried to have A.C. socialize

with his cousins, however, it resulted in bickering and physical fighting, so she said A.C. must be

supervised and monitored in social situations.  Id.

Plaintiff reported that she stopped letting A.C. play video games because he would

become angry and destructive if he lost a game.  R. 58-60.  He has poked holes in walls,

damaged equipment, broken a laptop, and cracked televisions.  R. 60.  She has noticed that A.C.

has picked up bad behavior from YouTube, TikTok, and video games.  R. 58.  Plaintiff then

allowed A.C. to play video games for his birthday after she had prohibited them for a long time. R. 60. Unfortunately, after he lost a game, he poked more than fifty holes in the wall of Plaintiff's rental house because he was mad. Id. Plaintiff no longer lets A.C. play videogames. R. 61. A.C. uses a laptop or tablet at school but the school monitors what he is doing on it. R. 62.

During the pandemic, Plaintiff bought A.C. a bike to get some physical exercise, but he would run off and leave the block despite her instructions not to do so. R. 60. A.C. had run off on previous occasions and has behaved this way since he was a toddler. Id.

Prior to switching to his current grade school—Girard College Prep—A.C. attended Shawmont School. R. 70, 206-07, 267. Shawmont recommended that A.C. go to a behavioral support school like his cousin, but Plaintiff refused. R. 63-64. Plaintiff stated that she did not want to send A.C. because he was "way too impressionable" and would "pick up too many behaviors," and was concerned about the students at the school, many of which engaged in criminal behavior and had substance abuse issues. R. 64.

Plaintiff described a typical day with A.C., who was eleven years old and in sixth grade at the time of hearing. R. 41, 64. He had difficulty going to sleep without medication because of hyperactivity and Plaintiff had to prompt him to wake up and get out of bed. R. 64. Despite rolling up A.C.'s clothing and putting his outfit in a shoe organizer, A.C. would come downstairs in November wearing clothing more appropriate for the middle of August. R. 64-65. Plaintiff testified she had to direct him every morning to brush his teeth, remind him to wash his face, put on socks, or wear shoes instead of sandals, if appropriate, which was emotionally draining for her. R. 65. Plaintiff estimated redirecting A.C. about ten times during a virtual school day, from

approximately 8:00 a.m. to 3:00 p.m.  R. 66.  A.C.'s Individualized Education Program ("IEP") included one-on-one support at school, but the one-on-one support did not occur when school became virtual.  R. 67.  A.C. received tutoring sessions on Fridays as additional support.  R. 68-69.  The NET was trying to re-establish A.C.'s family-based services (that had just concluded) and determine what services they could provide while A.C. was in school virtually, including a therapist.  R. 69-70.  Girard College Prep accommodated A.C. while in virtual school by moving deadlines because of his challenges paying attention.  R. 71-72.

I now turn to the medical records.  In April 2019, during third grade when A.C. was eight years old, the NET conducted a comprehensive biopsychological evaluation of him.  R. 267.  A.C. had an IEP at school and had been placed in a regular education setting at that time.  R. 267-68.  Plaintiff brought A.C. to the NET to determine if services from the Philadelphia Autism Center of Excellence Behavioral Health Rehabilitative Services were medical necessary.  R. 268.  At that time, A.C. had been authorized for BSC-ASD (Board Certified Specialist in Autism Spectrum Disorders) services, two hours per week, and SCH-Therapeutic Staff Support-ASD fifteen hours per week until May 15, 2019.  Id.  He also attended outpatient therapy at the Center for Autism.  Id.  Plaintiff expressed concern about A.C.'s inability to focus, hyperactivity, talking back, defiance, and fighting with peers.  Id.  She reported he will go from "0 to 100" and will "snap out" and break and kick things.  Id.  A.C. was taking Adderall and vitamins at the time of the evaluation.  R. 267, 299.  His BSC, Crystal Carmody, who was present at the evaluation, reported non-compliance, inattentive and hyperactive behavior, loud verbal outbursts, disrespect for peers and adults, and poor conversation skills.  R. 268.  The report noted that A.C. had regressed during that authorization period.  Id.  During the exam, the evaluator noted that A.C.

11

was talkative and articulate and described cognition, although not formally assessed, was likely in the average to above average range. R. 269. A.C. identified several students who were his friends, including one student who is his best friend. Id. A.C. also said he had many friends in the upper grades. Id. When asked about bullying, Plaintiff said it "goes both ways" with A.C. and his peers. Id.

On March 3, 2020, Karen L. Kampmeyer, Ph.D., from the Center for Autism conducted another comprehensive biopsychosocial evaluation of A.C. when he was nine-years old and in fourth grade. R. 294-307. A.C. was previously given a provisional autism diagnosis in October 2014, and in March 2016 he was revaluated and diagnosed with ASD by history, and Attention-Deficit/Hyperactivity Disorder (ADHD), combined presentation. R. 294, 299. Plaintiff sought reevaluation so A.C. could return to outpatient therapy at the Center for Autism. R. 294. Plaintiff reported that A.C. regressed behaviorally since he stopped outpatient therapy which he had attended for five years. R. 294, 299.

Dr. Kampmeyer described her observations and mental status examination of A.C. R. 304. She said A.C. met the evaluator's gaze and returned her outstretched hand in greeting. Id. Dr. Kampmeyer easily established a rapport with A.C. Id. A.C., however, did not make consistent eye contact. Id. Nevertheless, he answered questions in an open manner and easily engaged in conversation. Id. A.C. used complex language and detailed responses, which moved the conversation forward. Id. He identified friends at school. Id. A.C. admitted he got angry easily when his peers do not stop making annoying noises or when his grandmother told him to do chores or stop playing videogames. Id.

12

A.C. was alert and oriented during the session.  R. 305.  He appeared "open and at ease with the evaluator."  Id.  Dr. Kampmeyer stated that A.C. "displayed appropriate social-emotional reciprocity while interacting with her and conversed easily."  Id.  His mood was euthymic, and he had appropriate affect.  Id.  Dr. Kampmeyer explained that A.C. "displayed a level of social-emotional reciprocity that is markedly inconsistent with a diagnosis of [ASD]." Id.

While it took A.C. awhile to focus and cooperate in his Aikido class, as of March 2020, the evaluation reported he was attentive to his instructors and "functions at his highest level."  R. 295.  When encountered with diagnostic testing, A.C. initially complained at the number of items that had to be completed, but with Dr. Kampmeyer and Plaintiff's encouragement, he agreed to complete it.  R. 304.  A.C. displayed some fidgety and repetitive behavior with his fingers, however, no mannerisms or signs of restrictive or repetitive behavior during the examination.  R. 305.

A.C. denied that he had suicidal or psychotic thinking, and none was reported.  Id. Plaintiff stated that A.C. still requires repeated reminders, even for certain routines that have been the same for several years.  R. 296.  He is disorganized at school and often requires redirection.  R. 64, 296.  Plaintiff recounted A.C.'s poor frustration and anger management.  R. 294-95.  A.C. did well in therapy, however, a few months after it ended A.C. "went off like an atomic bomb."  R. 295.  Specifically, his behavior became more unstable, and unpredictable, and she feared she could not safely raise him.  Id.  When A.C. becomes angry, he goes to his room to calm down.  Id.  A.C. said it helps him "get his rage out."  Id.  Episodes generally last ten minutes and after A.C. can talk to Plaintiff about what is bothering him and process his behavior.

Id.  When he is angry, A.C. engages in risky, threatening behavior.  R. 294.  Plaintiff said that

"she believes [A.C.] has many traumatic events buried inside him that leads to such extreme

behavior, rather than the immediate trigger, itself."  Id.  Dr. Kampmeyer observed A.C.'s low

frustration tolerance during the examination, however, when A.C. was allowed to feel the

emotion and chose his corresponding action, he was able to manage it appropriately and

independently.  R. 305-06.  The report provides that A.C. might need space when he is frustrated

so he can connect his thoughts and feelings and then respond.  R. 306.

The report concluded that A.C. had a diagnosis of ADHD and intermittent explosive

disorder.  Id.  A.C. was instructed to continue Behavioral Health Rehabilitative Services (BHRS)

for anger management and that providers work from a trauma-informed model of care.  Id.  If the

progress with BHRS was limited, the report recommended that family-based services should be

provided.  Id.  Finally, the report noted that A.C.'s diagnosis of ASD was never clarified beyond

a "preliminary" or provisional diagnosis, so he should be re-evaluated to have that diagnosis

clarified.  R. 41-43, 299, 306-07.

During a June 2020[7] comprehensive biopsychosocial re-evaluation at the NET,

Psychologist Diane Findley evaluated A.C.  R. 282.  During the mental status examination, A.C.

again engaged easily with the evaluator and his speech was clear and of average rate and volume.

R. 284.  He was appropriately oriented for his age, his mood was neutral, and his affect was

congruent.  Id.  A.C. described feeling both happy and angry.  Id.  He said he was angry when he

had to do schoolwork and chores.  Id.  A.C. also worried about getting sick if he had to leave the

---

[7] Although the ALJ's decision stated the evaluation took place in July 2020, it occurred on June
3, 2020.  R. 282.  The evaluation took place via telehealth because of the CDC social distancing
guidelines in effect at the time.  Id.

house and only left the house to go the store with Plaintiff.  Id.  A.C. had no suicidal thoughts or wishes to harm himself.  Id.  Ms. Findley described A.C. as a pleasant boy with a difficult start to his life.  R. 285.

Ms. Findley reported that A.C. was smart and capable of performing well academically. Id.  With appropriate support, A.C. was able to function well in a regular classroom, but the support was not constantly available.  Id.  She believed that Plaintiff and A.C. needed more intensive support to help them better manage the home setting and transfer those skills to the school setting.  Id.  Ms. Findley recommended that A.C. have family-based services to address the non-compliance, defiance, and disruptive behavior issues.  Id.  She removed his prior diagnosis of Disruptive Mood Dysregulation Disorder but added the diagnosis of Other Specified Trauma- and Stressor-Related Disorder.  Id.

On January 19, 2021, T. David Newman, Ph.D., conducted a child mental health status evaluation of A.C. on Zoom.[8]  R. 340.  During the exam, A.C. was cooperative and related in an age-appropriate manner.  R. 342.  He spoke fluently and articulated clearly.  Id.  His mood was reasonably euthymic, and he had a fair range of affective expression.  Id.  A.C. made eye contact and presented with normal posture and motor behavior.  Id.

Plaintiff conveyed that A.C. had a problem with attentional focus, but that was not an issue during the exam.  R. 341-42.  Dr. Newman stated that A.C. was never distracted and could

---

[8] The ALJ found Dr. Newman's opinion generally persuasive.  R. 27, 341.  Although Mr. Newman did not use specific language such as no limitation, less than marked, marked or extreme limitation, the ALJ said that he included "brief comments of value" when he assessed the claimant's level of functioning.  Id.  Specifically, he found A.C.'s ability to interact and relate with others is adequate for adults, but that he struggles with peers.  Id.  Regarding caring for himself, A.C. has difficulty selecting appropriate clothing.  Id.  Finally, A.C.'s ability to attend to and complete tasks is adequate when A.C. takes his medication.  Id.

calculate exact change and perform serial threes; he was not as consistent when multiplying single digits. R. 342. He appeared his age and wore casual attire with satisfactory personal hygiene and grooming. Id. A.C.'s insight was age-appropriate, with limitations regarding social interactions. R. 343. A.C. could recognize obvious sources of hazard and had social judgment that was limited. Id. As Plaintiff testified, the report mentioned that A.C. needed reminders to dress appropriately for the weather, and he usually threw fits about doing chores. Id. A.C. could and would help himself to snacks. Id. A.C. did not like taking the bus when school was in session because of the stimuli and noises on the bus. Id. A.C.'s diagnosis was ASD, severity level 1 and ADHD, predominantly inattentive type. Id.

On February 22, 2021, Dr. Gio Rao, M.D., conducted a psychiatric exam of A.C., who was ten years old at the time and in sixth grade. R. 528, 531. A.C. was appropriately groomed. R. 532. The mental status exam found that A.C. was calm and cooperative, with euthymic mood and affect. Id. A.C.'s concentration and memory were grossly intact, and he was oriented as to person, place, time, and situation. Id. At the time, Plaintiff reported no history of suspensions or expulsions. Id. A.C. earned As and Bs in school and was an honor student. R. 528. A.C. denied suicidal ideations, homicidal ideations, or self-harm gestures. R. 530.

A.C.'s insight was good, and his judgment was fair. R. 532. Plaintiff reported that A.C. had some anger issues and could go from "1-1000" and become destructive, but he would eventually redirect. R. 528.

Dr. Rao recommended that A.C. begin taking an immediate release formulation of his psychostimulant Adderall to mitigate his sleep issues and help with focus and attention. R. 533. Additionally, Dr. Rao said efforts should be made to reinstate TSS in the online setting and for

A.C. to participate in office-based psychotherapy on a regular weekly or bi-weekly basis.  R. 533-34.  Dr. Rao also recommended processes and routines to help with A.C.'s behavior.  R. 533-34.

In August 2021, A.C. had an IEP in place at Shawmont School to begin the 2021-2022 school year.  R. 355.  His behavior measured by the Behavior Assessment System for Children, Third Edition (BASC-3) showed a high level of behavior consistent with the possibility of ADHD.  R. 369.  His teachers reported that he demonstrated grade level achievement abilities. Id.  The IEP states that A.C.'s behavior issues and autism required curb to curb transport to ensure safe transport.  R. 376.

NET treatment notes dated September 25, 2021 regarding a telehealth appointment with social worker Mr. McCaskill, indicated that A.C. reported he is doing "good" with his behavioral issues and was now running the usual errands with Plaintiff.  R. 560-61.  Plaintiff reported she only had to redirect A.C.'s defiant behavior a few times that week.  R. 561.  A.C. sounded like he was in a relaxed mood during the session.  Id.  A.C. agreed, with his therapist, to use coping skills to remain calm when he was in crisis so he can make good decisions, and A.C. agreed that he wanted to work on being a better person and establishing better relationships with adults at home and school.  Id.

V.    **<u>DISCUSSION</u>**[9]

**A.  <u>The ALJ's finding that A.C. has less than a marked limitation in the domain of interacting and relating with others is supported by substantial evidence.</u>**

When evaluating a child's limitations in the domain of interacting and relating to others, the ALJ should consider "how well the child initiates and sustains emotional connections with others, develops and uses the language of his or her community, cooperates with others, complies with the rules, responds to criticism, and respects and takes care of the possessions of others."  <u>Tusing ex rel. J.K. v. Colvin</u>, No. 14-cv-435, 2014 WL 5493191, at *8 (M.D. Pa. Oct. 30, 2014); <u>see also</u> 20 C.F.R. § 416.926a(i); <u>see generally</u> <u>Title XVI: Determining Childhood Disability–The Functional Equivalence Domain of "Interacting and Relating with Others</u>," SSR 09-5P, 2009 WL 396026, at *3-*5 (Feb. 17, 2009).  This domain involves the feelings and behavior of the child in relation to other people.  2009 WL 396026, at *4.

20 C.F.R. § 416.926a(i)(3) includes examples of limited functioning in this domain that children of different ages may have, however, these examples do not necessarily describe marked or extreme limitations.  <u>See</u> <u>Suarez o/b/o E.S. v. Kijakazi</u>, 21-cv-00023, 2022 WL 2911673, at *7 (M.D. Pa. July 22, 2022).  Some examples of difficulty in this domain are that the child does not reach out to be picked up and held by caregiver, the child has no close friends, or friends are all older or younger than the child, the child avoids or withdraws from people the child knows or is overly anxious or fearful meeting new people or trying new experiences, the

---

[9] Plaintiff did not argue in her brief that the ALJ erred when it found that A.C.'s severe impairments did not meet Listings 112.04, 112.08, 112.10, and 112.11.  Doc. 8, at 2-13.  Thus, any of those arguments have been waived.  <u>See</u> <u>Davis v. Comm'r Soc. Sec.</u>, 849 F. App'x 354, 359 (3d Cir. 2021) (stating issue not raised in claimant's opening brief was forfeited) (citation omitted).

child has difficultly playing games or sports with rules, the child has difficulty communicating

with others, for example, using verbal and non-verbal skills to express himself or herself,

carrying on a conversation, or asking others for assistance, and the child has difficulty speaking

intelligently or with adequate fluency.  20 C.F.R. § 416.926a(i)(3)(i)-(vi).

> Regarding this domain, the ALJ found:

> On examination in March 2020, the claimant met the evaluator's gaze and returned her outstretched hand in greeting.  He readily accompanied her into the assessment.  He and the evaluator established a rapport easily.  He did not make consistent eye contact, but answered questions in a relaxed, open manner.  He easily engaged in conversation.  He regularly used complex language and provided detailed responses, which moved the conversation forward.  The claimant appeared open and at ease with the evaluator.  He displayed appropriate social-emotional reciprocity while interacting with her and conversed easily.  This level of social-emotional reciprocity was markedly inconsistent with a diagnosis of autism spectrum disorder.  His mood was generally euthymic with appropriate affect.  Psychologist Karen L. Kampmeyer, Ph.D. noted that his diagnosis of autism spectrum disorder has never been clarified beyond a preliminary or provisional diagnosis.  As such, she recommended revaluation.  In July 2020, the claimant was able to participate in a comprehensive biopsychosocial evaluation.  He easily engaged with the evaluator.  His speech was clear and of average rate and volume.  He displayed adequately developed language skills.  His mood appeared neutral, and his affect was congruent.  He had been feeling both angry and happy.  He was very pleasant.    In January 2021, the claimant was reportedly argumentative with other children, but he got along well with adults. On examination, he was cooperative and related in an age-appropriate manner.  His speech was fluent and clearly articulated.  There was a fair range of affective expression, and his mood was reasonably euthymic.  He made eye contact.  In February 2021, the claimant, then a sixth grader, had no history of suspensions or expulsions.  On examination, he was calm and cooperative with fluent, productive speech of normal tone, decreased volume, and impaired prosody.  His mood was euthymic and good.  His affect was also euthymic. Psychotherapy notes from August 2021 indicate that the claimant's teachers had not reported any serious anger outbursts.  By September 2021, the claimant's grandmother had had

> to redirect his defiant behaviors only a few times that week. The
> claimant was in a relaxed mood during the session.

R. 25 (internal citations omitted).

Plaintiff first argues that the ALJ erred when she found that A.C. has less than a marked limitation in the domain of interacting and relating with others. Doc. 8, at 4. Specifically, Plaintiff claims the fact A.C. had not been suspended or expelled from school and only had to be redirected a few times one week in September 2021 is not proof that A.C. has less than a marked limitation in this domain. Doc. 8, at 4-5. That, however, is only some of the evidence the ALJ cites to support her finding that A.C. had less than a marked limitation in the domain of interacting and relating with others.

The ALJ also pointed out that A.C. uses complex language well, was articulate, and easily engaged with the adults during evaluations. R. 269, 284, 304, 342. A.C. generally gets along well with adults. R. 341. Even though the record indicated A.C. did not always get along as well with other children, he identified friends at school, including in his grade. R. 57-58, 269, 304. Moreover, Plaintiff reported she voluntarily limited A.C.'s social interaction during the pandemic because of her health issues and could not risk getting sick. R. 58.

Plaintiff also claims that A.C.'s ability to relate well with his evaluators "seriously downplays" other significant evidence demonstrating A.C. has a marked limitation interacting and relating with others. Doc. 8, at 5. Plaintiff points out that A.C. has become easily angered, has low frustration tolerance, outbursts, and limited social judgment and ability to read social cues. Id. at 5-8. While the record illustrates some limitations that A.C. has in this domain, none of them rise to the level of a marked limitation because they do not show that they interfere

seriously with A.C.'s ability to initiate, sustain, or complete activities.  See 20 C.F.R. §

416.926a(e)(2)(i) (emphasis).

As noted in the ALJ's decision, A.C., on at least four separate occasions during exams

engaged with the evaluators, provided detailed responses, developed a rapport, and cooperated

and related in an age-appropriate manner.  R. 269, 284, 304-05, 342.  This type of behavior

supports a finding that any limitation A.C. had interacting and relating to others was less than

marked.  Compare with 20 C.F.R. § 416.926a(i)(3)(i)-(vi); see also Hunter ex. rel. E.J. v. Astrue,

No. 10-cv-3036, 2011 WL 3513059, at *2-*4 (E.D. Pa. Aug. 10, 2011) (holding record

supported ALJ's finding that, despite some limitations interacting and relating to others, plaintiff

has less than marked limitation because, in part, he generally got along with adults, school

teachers, and has friends).  Dr. Kampmeyer noted that A.C. displayed "appropriate social-

emotional reciprocity while interacting with her and conversed easily" which was "markedly

inconsistent" with what she would expect for a child with ASD.  R. 305.  For that reason, she

recommended additional testing and re-evaluation, which Plaintiff never scheduled.  R. 305.

A.C. admitted he got angry, usually when his peers would not stop making annoying

noises or when his grandmother told him to do chores.  R. 304, 343.  A.C.'s low frustration

tolerance was also mentioned and observed during an evaluation.  R. 305-06.  But Dr.

Kampmeyer stated that when A.C. was allowed to "feel the emotion and choose an action, he

appeared to manage it appropriately and independently" and suggested that he be given "space"

when this happens.  R. 306.  The record indicates A.C.'s limited social judgment and ability to

read social cues had also caused a problem for A.C. when he tried to play on a baseball team; he

would fight with the other children because they were too close to him in line.  R. 57.

Despite these limitations, A.C. had no history of suspensions or expulsions.  R. 528, 531. With support, he did well academically at school and teachers had not reported any serious anger outbursts pursuant to the August 2021 notes.  R. 285, 528, 531.  Dr. Rao's notes from February 2021 stated that A.C. earned As and Bs and was an honors student.  R. 531.  The September 25, 2021 treatment notes reported that Plaintiff only had to redirect A.C.'s defiant behaviors a few times that week.  R. 560-61.  Dr. Rao's notes further provided that A.C. now accompanies Plaintiff when running errands and was "doing ok with his behaviors at home and in school."  R. 561.  All this evidence supports a less than marked limitation like the ALJ found.  See Hunter, 2011 WL 3513059, at *3-*4.

Although certain evidence suggests that A.C. had some limitations relating and interacting with others, including the evidence Plaintiff cited in her brief,[10] it is not the Court's role to re-weigh the evidence or impose its own factual determinations.  See Chandler v. Comm'r Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citations omitted); see Hunter, 2011 WL 3513059, at *2-*4 (stating even if evidence may have persuaded ALJ to rule differently in first instance, reasons ALJ proffered for finding child has less than marked limitation interacting and relating with others supported ALJ's conclusion and therefore Court denied request for review). Substantial evidence in the record as a whole supports the ALJ's finding that A.C. has less than a marked limitation in this domain.  Therefore, Plaintiff's first claim fails.

---

[10] See Doc. 8, at 5-8.

**B.  The ALJ's finding that A.C. has less than a marked limitation in the domain of caring for himself is supported by substantial evidence.**

The domain of caring for oneself considers how well a child maintains a healthy emotional and physical state, including how well the child gets his or her physical and emotional wants and needs met in an appropriate way, how the child copes with stress and changes in his or her environment, and whether the child takes care of his or her own health, possessions, and living area.  20 C.F.R. § 416.926a(k); Cynthia W. on behalf of T.C. v. Kijakazi, No. 19-cv-15806, 2021 WL 4520380, at *8 (D.N.J. Oct. 4, 2021).  Caring for oneself involves the child's feelings and behavior in relation to self (as when controlling stress in an age- appropriate manner).  SSR 09-5p, at *4.  As applied to a child A.C.'s age, examples of limited functioning in caring for oneself include the child does not dress or bathe oneself appropriately for his or her age, the child engages in self-injuries behavior (e.g., suicidal thoughts or actions, self-inflicted injury or refuses to take medication) or ignore safety rules, the child does not spontaneously pursue enjoyable activities or interests, and the child has disturbances in eating or sleeping patterns.  20 C.F.R. § 416.926a(k)(3).

When finding A.C. had less than a marked limitation in caring for himself, the ALJ stated:

> In March 2020, the claimant's grandmother expressed concern about the claimant's poor frustration management and aggressive behaviors.  However, he had done well while in therapy and for a few months following therapy.  Since then, his behavior has become more unstable and unpredictable.  When angry, the claimant would retreat to his room to calm down, which he found helpful, but his grandmother added that he would often break items in his room.  The claimant had a hard time with change.  The claimant would engage in risky, threatening behavior when angry.  Although the claimant displayed low frustration tolerance during diagnostic testing, he appeared to manage it appropriately and independently when

23

allowed time to feel the emotion and then choose an action. On examination in July 2020, the claimant denied any suicidal thoughts or wishes to harm himself. The claimant required a high level of attention from his sole caregiver and had not developed the ability to take care of his tasks independently without a high level of monitoring from his grandmother, which had been especially difficult since the pandemic. The claimant continued to be extremely active and impulsive, which also contributed to non-compliance. On examination in January 2021, the claimant was casually attired with satisfactory personal hygiene and grooming. His insight was age-appropriate with limitations regarding social interactions. He was capable of recognizing obvious sources of hazard; his social judgment was limited. The claimant needed constant reminders to dress appropriately. It was not uncommon for him to pick clothing unsuitable for the weather or setting. When asked to do household chores, he would throw a tantrum. He could help himself to snacks. The claimant took a school bus to school, which his grandmother reported as being quite difficult for him due to stimuli, including noise. In February 2021, the claimant's grandmother reported that the claimant could become disruptive, but he would eventually redirect. He had low frustration tolerance. The claimant's anger outbursts had never really escalated to harming himself or others, and he denied current or previous suicidal ideation or homicidal ideation. On examination, he appeared appropriately groomed. His insight was good, and his judgment was fair. In August 2021, the claimant's IEP indicated that, as measured by the Behavior Assessment System for Children, Third Edition (BASC-3), the claimant struggled with behavior and emotional regulation while showing typical levels of problem solving and attention skills. The claimant's severe behaviors made him eligible for specialized transportation consisting of curb-to-curb pickup and delivery. Psychotherapy treatment notes from September 2021 indicate that the claimant was doing well and would accompany his grandmother on errands.

R. 26 (internal citations omitted).

Plaintiff argues the record overwhelmingly establishes that A.C. has at least a marked and more likely an extreme limitation in the domain of caring for himself. Doc. 8, at 8. Plaintiff cites to evidence that A.C. has specialized curb-to-curb pickup and delivery, A.C. sometimes struggled with behavior and emotional regulation and was unpredictable at times, he engaged in

risky and threatening behavior when angry, he needed a high level of monitoring from Plaintiff

and constant reminders to dress appropriately, and he would throw a tantrum when asked to do

chores.  Id. at 9-10.  Plaintiff also states that A.C. had run off on several occasions both in and

out of school.  Id. at 10.

Some record evidence supports a finding that A.C. had less than a marked limitation

caring for himself.  A.C.'s insight was classified as "age appropriate" and he was able to

recognize obvious sources of hazards.  R. 343; 20 C.F.R. § 416.926a(k).  Multiple reports from

several medical providers noted that A.C. never had any suicidal or homicidal thoughts or wishes

to harm himself.  R. 284, 305, 331, 530.  Additionally, the record shows that A.C. was able to

meet his physical needs by independently helping himself to snacks.  R. 343; 20 C.F.R. §

416.926a(k).  Finally, several providers noted A.C. had satisfactory personal hygiene and was

well-groomed during January and February 2021 examinations.  R. 342, 532.

Nevertheless, it is true that the record contains evidence that A.C. also has some

challenges in this domain.  A.C. at times has poor frustration control, anger management, and

aggressive behavior.  R. 294-95, 305-06.  But Dr. Kampmeyer said A.C. was able to manage it

appropriately and independently when A.C. was allowed to process the emotion and chose how

to respond, which the ALJ cited as evidence in support of her finding regarding this domain.  R.

26, 305-06.  When Plaintiff asked A.C. to do chores, he would throw a tantrum.  R. 284, 304,

343.  She also testified that A.C. needed constant reminders to dress appropriately for the season

and would often come downstairs in clothes appropriate for the wrong season.  R. 64-65, 343.

He qualified for specialized transportation to and from school because of his behavior.  R. 376.

A.C. also scored in the very elevated range on the Behavior Assessment Scale for Children-Third

Edition (BASC-III) and struggled behaviorally at home and in the classroom, presenting with symptoms consistent with ADHD and autism.[11] R. 407.

One can debate whether these limitations interfere seriously with A.C.'s ability to take care of himself and rise to the severity of a marked limitation. Compare Washington v. Barnhart, 41 F. App'x 52, 53-54 (9th Cir. 2002) (plaintiff's fecal incontinence at age fifteen daily and/or nightly and remaining unconcerned about odor constituted marked limitation in caring for himself for purposes of determining SSI benefits); see 20 C.F.R. § 416.926a(e)(2)(i). The ALJ found that they did not and provided substantial evidence in support of that conclusion. See 20 C.F.R. § 416.927(d)(1); see also Glant o/b/o G.H. v. Saul, 20-cv-1755, 2022 WL 178825, at *8 (M.D. Pa. Jan. 18, 2022) (citations omitted) (stating "possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence.").

Even if the ALJ should have found A.C. had the functional equivalent of a marked limitation in the domain of caring for himself, any error would constitute, at most, harmless error. Plaintiff cannot demonstrate that A.C. has another functional equivalent of a marked limitation, or the functional equivalent of any one extreme limitation regarding interacting and relating with others and attending to and completing tasks. See SSR 09-2P, at *1; 20 C.F.R. § 416.926a(a). Without a finding that A.C. has the two marked or one extreme limitation required to functionally equal the listing, A.C. cannot be found disabled on these grounds. 20 C.F.R. § 416.926a(a). Accordingly, any arguable error regarding this domain was harmless because it

---

[11] Importantly, the record shows that any provisional autism diagnosis was never verified with a subsequent re-evaluation. R. 307. Additionally, any ASD impairment was rated level 1 – the lowest level of severity. R. 325, 333, 533.

would not have affected the ultimate outcome regarding A.C.'s purported disability.  See e.g.,

Rutherford, 399 F.3d at 553 (finding error is harmless if it will not affect outcome of the case);

Hyer v. Colvin, 72 F.Supp.3d 479, 494 (D. Del. 2014) (citations and quotations omitted)

(harmless error rule applies to social security cases and stating error is not harmless if it

prejudices party's substantial rights, meaning would likely affect outcome of proceeding).

### C.  The ALJ's finding that A.C. has less than a marked limitation in the domain of attending and completing tasks is supported by substantial evidence.

 Finally, the domain of attending and completing tasks determines "how well a child is

able to focus and maintain attention, and how well he is able to begin, carry through, and finish

activities, including the mental pace at which he performs activities and the ease of changing

activities."  Williams o/b/o J.H. v. Kijakazi, No. 20-cv-00624, 2021 WL 4439438, at *6 (M.D.

Pa. Sept. 28, 2021); see also 20 C.F.R. § 416.926a(h); Title XVI: Determining Childhood

Disability–the Functional Equivalence Domain of "Attending & Completing Tasks," SSR 09-4P,

2009 WL 396033, at *2 (Feb. 18, 2009).  This domain also refers to a child's ability to avoid

impulsive thinking, prioritize tasks, and manage his or her time.  Williams, 2021 WL 4439438, at

*6.

Examples of limited functioning in this domain include that child is easily startled,

distracted, or overactive to sounds, sights, movement, or touch, the child is slow to focus on, or

fails to complete activities of interest to him or her, e.g., games or art projects, child repeatedly

becomes easily sidetracked from activities or frequently interrupts others, the child is easily

frustrated and gives up on tasks, including ones the child is capable of completing, and the child

requires extra supervision to keep him or her engaged in an activity.  See 20 C.F.R. §

416.926a(h)(3); SSR 09-4P, 2009 WL 396033, at *5-*6.

When discussing the domain of attending and completing tasks, the ALJ noted:

> By March 2020, the claimant had earned a brown belt in Aikido. Although it had initially taken him a while to focus on training and cooperate, he was now attentive to the instructors and functioned at the highest level. During diagnostic testing that same month, the claimant balked when he saw the number of items to be answered, but, with encouragement from the evaluator and his grandmother, he agreed to complete it. The claimant displayed some fidgety behaviors with his fingers, but no mannerisms or other signs of restricted or repetitive behaviors. In July 2020, the claimant was able to function well in the classroom with appropriate support. Based on his grandmother's report in January 2021, the claimant had a problem with attentional focus. On examination, he was never distracted. He calculated exact change and performed serial threes. He was not quite consistent multiplying single digits. The following month, the claimant's concentration and abstraction were grossly intact. He was oriented to person, place, time and situation.

R. 25 (internal citations omitted).

Plaintiff argues the ALJ erred when she determined that A.C. had less than a marked limitation in the domain of attending and completing tasks. Doc. 8, at 10-13. Plaintiff asserts that the ALJ failed to mention the support A.C. required in the classroom (as set forth in his IEP), A.C.'s low baseline goals related to following directions, his scores indicating problems with attention, a few specific instances in which teachers relayed A.C. was distracted during class, that A.C. did not complete his work at times, and Plaintiff's reporting that she had to redirect A.C. ten times a day during virtual learning. R. 12-13.

Preliminarily, the ALJ is not required to refer to every piece of evidence in its functional equivalence analysis. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). Additionally, the ALJ specifically mentioned that A.C. was receiving support and detailed this support throughout her opinion. R. 19-26, 67, 267-68, 285, 355. She concluded that with this support A.C. was capable and was functioning well in the classroom demonstrating grade level

achievement.  R. 285, 342, 362, 531.  He was an honors student and received As and Bs.  R. 83, 531.  Moreover, the ALJ noted that A.C. had the capability and focus to train and earn a brown belt in Aikido after taking classes for several years.  R. 56, 295.  During an exam with Dr. Newman, A.C. was never distracted and could calculate exact change and perform serial threes.  R. 342.  These facts indicate less than a marked limitation as the ALJ found.

This does not mean A.C. had no issues or limitations in the classroom.  A.C. would fidget, had problems paying attention, and can be distracted in class.  R. 44, 71, 259, 271, 305, 341, 369.  He also often had to be redirected.  R. 55, 64, 83, 296.  While he generally does well in school, A.C. has struggled academically at times.  R. 252-54, 258-59.  He was on the academic watch list in December 2021 and as a result was at risk for losing a scholarship.  R. 256.

When A.C. was taking his medication, Adderall, his grandmother noticed improvement in his behavior and his schoolwork.  R. 528.  In February 2021, she reported that A.C. "has been doing well on the medication, furthering that he readily copes with stressful situations and is able to focus on the schoolwork."  R. 528, 533.  Plaintiff, however, chose to stop A.C.'s medication in the summer of 2021 because it affected his sleep, and she became concerned that it would cause a cardiac event and, if it did, would expose her and A.C. to COVID if she ever had to take him to the hospital.  R. 49-51, 83, 299.  Plaintiff's choice to discontinue A.C.'s medication when it had improved his behavior and schoolwork, particularly in the domain of attending and completing tasks, also weighs against the finding of a marked limitation in this domain.  See, e.g., 20 C.F.R. § 416.930 (requiring child claimant follow physician's prescribed treatment if treatment could reduce child's functional limitations so they are no longer marked and severe); Young v. Colvin,

No. 13-cv-00248, 2014 WL 4918325, at *16 (M.D. Pa. Sept. 30, 2014) (citations omitted) (stating Third Circuit recognizes medical conditions that can be "reasonably controlled" by medication and treatment are not considered disabling); Brown ex. rel. Brown v. Comm'r of Soc. Sec., 311 F. Supp. 2d 1151, 1160 (D. Kan. 2004) (citation omitted) (noting if medication can control impairment, claimant is not disabled unless he or she has a justifiable reason for refusing to take medication).

Again, even though the record indicates some limitations in this domain, the evidence supports a finding that A.C. did not have a marked limitation that interfered seriously with his ability to attend and complete tasks.  See 20 C.F.R. § 416.926a(e)(2)(i); see also Gomes v. Astrue, 633 F. Supp. 2d 171, 185 (S.D.N.Y. 2009) (upholding Commissioner's decision based on substantial evidence that ten-year old claimant with ADHD had less than marked limitation attending and completing tasks, in part, because even though mother testified he could not "do things on his own," would not sit still for long periods of time, got off track at school, and had bad impulse control, other evidence showed he could follow directions, pay attention to detail, and complete homework without significant parental involvement and his symptoms improved with medication), vacated on other grounds, No. 09-cv-3771, 2011 WL 1900579, at *1 (2d Cir. Apr. 29, 2011).  Like Plaintiff's other challenges to the ALJ's decision, her argument here can be characterized as a request to re-weigh the evidence—something the Court is not permitted to do. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986); Rutherford, 399 F.3d at 552 (citation omitted); see also Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009) (citation omitted) (stating the "presence of evidence in the record that supports a

contrary conclusion does not undermine the Commissioner's decision so long as the record

provides substantial support for that decision").

For these reasons, Plaintiff's final claim fails.

**VI.**     <u>**CONCLUSION**</u>

Substantial evidence supports the ALJ's findings regarding the three challenged domains

of functioning.  For the reasons discussed above, Plaintiff's request for review (Doc. 15) is

**DENIED**.

An appropriate order follows.


BY THE COURT:

<u>/s/ Craig M. Straw</u>
CRAIG M. STRAW
U.S. Magistrate Judge

31